## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**WILLIE REMBERT,**
        **Petitioner,**

**v.**                                                    **Case No. 4:09cv387/SPM/MD**

**KENNETH S. TUCKER,**
        **Respondent.**

_____

## REPORT AND RECOMMENDATION

This case is before the court on Willie Rembert's ("Mr. Rembert") September 30, 2009 petition for habeas corpus (doc. 1) filed pursuant to 28 U.S.C. § 2254. Respondent filed an answer (doc. 13) and relevant portions of the state court record (doc. 24). Mr. Rembert filed a response to the answer (doc. 19). The matter was referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B). After careful consideration of all issues raised by petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts. It is further the opinion of the undersigned that the pleadings and attachments before the court show that Mr. Rembert is not entitled to relief, and the petition should be denied.

## BACKGROUND AND PROCEDURAL HISTORY

On September 29, 2004, Mr. Rembert was charged by an amended five count information with (1) attempted first degree murder, (2) armed robbery with firearm,

(3) burglary[1] of dwelling while armed, (4) aggravated assault with deadly weapon, and (5) possession of short-barreled firearm in violation of Sections 777.04(4)(b), 782.04(1)(a), 784.045(1)(a), 775.087, 812.13(2)(a), 810.02(2) and 790.221 respectively, Florida Statutes, in the Circuit Court of Leon County, Florida in case number 03-01825AF (doc. 24, ex. A)[2].  The charges stemmed from an incident on May 24, 2003 when Mr. Rembert and three other co-defendants, while carrying firearms, unlawfully entered the residence of Charlie Jason Owens ("victim"), stole his property, and caused him grave physical injuries.  *Id.*  On October 15, 2004, the jury found Mr. Rembert guilty of attempted voluntary manslaughter with possession of a firearm on count 1, armed robbery with a firearm on count 2, trespass on count 3, and possession of a short-barreled firearm on count 4 (ex. B, pp. 903-906, ex. C and ex. D).  The court sentenced him to five years in prison for count 1, life imprisonment for count 2, one year in prison for count 3, 15 years in prison for count 4, all to run concurrently, with 592 days of credit (ex. D and ex. E, pp. 41-42).

On February 20, 2006, Mr. Rembert's court-appointed counsel filed a brief with the Florida First District Court of Appeal ("First DCA") stating he could not in good faith argue that the trial court committed any reversible error ("*Anders*[3] brief") (ex. F).  Mr. Rembert then filed a *pro se* brief with the First DCA on November 6, 2006 (ex. G).  He raised four issues:  (1) "Whether the trial court abused its discretion in allowing the out-of-court pretrial identification and testimony thereof admitted into evidence?;" (2) "Whether the trial court abused its discretion in allowing the state to repeatedly elicit testimony through leading questions?;" (3) "Whether the trial

---

[1]During the jury instructions discussion, the state orally amended this charge as suggested by the trial judge to burglary with the possible aggravating factors of "while armed" and "person assaulted" thereby combining counts 3 and 4 (ex. B, pp. 712-719).

[2]Hereafter, all references to exhibits will be to those provided at Doc. 24.

[3]*Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967).

court erred in denying [his] motion for judgement (sic) of acquittal?;" and (4) "Whether the trial court abused its discretion in denying [his] motion for severance?" *Id.* at 3-4.  On February 28, 2007, the First DCA affirmed the trial court's judgment and sentence without issuing an opinion (ex. H).  Mr. Rembert then filed a motion for rehearing en banc, for written opinion, and for certification (ex. I), which was denied by the First DCA on April 30, 2007 (ex. J).

On July 9, 2007, Mr. Rembert filed a motion for reduction or modification of sentence pursuant to Rule 3.800(c), Florida Rules of Criminal Procedure (ex. L), which was denied on July 17, 2007 (ex. M).  On February 21, 2008, Mr. Rembert filed a motion for post conviction relief pursuant to Rule 3.850, Florida Rules of Criminal Procedure, alleging one ground of ineffective assistance of counsel (ex. N).  The Rule 3.850 court issued an order denying post-conviction relief on March 12, 2008 (ex. O).  On March 21, 2008, Mr. Rembert filed a motion for rehearing (ex. P), which was denied on April 2, 2008 (ex. Q).

On April 25, 2008, Mr. Rembert filed a notice of appeal to the First DCA (ex. R).  After no briefs were filed, on September 29, 2008, the First DCA per curiam affirmed the Rule 3.850's order (ex. S).  On October 16, 2008, Mr. Rembert filed a petition for writ of habeas corpus with the First DCA alleging ineffective assistance of appellate counsel (ex. U).  The state responded (ex. V), and the First DCA denied the petition on August 13, 2009 without issuing an opinion (ex. W).

Mr. Rembert filed the instant petition for federal writ of habeas corpus on September 30, 2009 (doc. 1), and respondent concedes its timeliness (doc. 13, p. 7).

## STANDARD OF REVIEW

Federal courts may issue habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death

Penalty Act of 1996 ("AEDPA").  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218-19 (1996).  In relevant part, Section 2254 provides:

> **(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --**
>
> **(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or**
>
> **(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.**

28 U.S.C. § 2254(d) (2006).

The Supreme Court explained the framework for Section 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[4]  Section 2254(d)(2) must be divided into two separate inquiries:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412–13 (O'Connor, J., concurring).  The federal habeas court "determining whether [it] should overturn the state courts' [sic] rejection of the claim at issue"

---

[4] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

should "review the highest state court decision disposing of the claim."  *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1237 (11th Cir. 2011); *see also Knowles v. Mirzayance*, 556 U.S. 111, 129 S. Ct. 1411, 173 L. Ed. 2d 251(2009).

Following the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" only when the Supreme Court's holding embodies the legal principle; dicta in opinions is not controlling.  *Thaler v. Haynes*, __ U.S. __, 130 S. Ct. 1171, 1173, 175 L. Ed. 2d 1003 (2010); *Bowles v. Sec'y for Dep't of Corr.*, 608 F.3d 1313, 1315 (11th Cir. 2010).  Furthermore, a federal court of appeals decision, "even a holding directly on point," cannot clearly establish federal law for Section 2254 purposes.  *Bowles*, 608 F.3d at 1316 (citing *Renico v. Lett*, __ U.S. __, 130 S. Ct. 1855, 1866, 176 L. Ed. 2d 678 (2010)).

After identifying the governing legal principle, the court determines whether the state court adjudication is "contrary to" clearly established Supreme Court case law, either because the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or because it "confronts a set of facts that is materially indistinguishable from a decision of [the] Court but reaches a different result."  *Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432, 161 L. Ed. 2d 334 (2005); *see* 28 U.S.C. § 2254(d)(1).  The state court does not need to cite to Supreme Court cases or even be aware of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).  If the state court decision is contrary to clearly

established federal law, the federal habeas court must independently consider the merits of petitioner's claim.

If the state court decision is not contrary to clearly established federal law, the federal habeas court must then determine whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 412–13. The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record the court had before it. *Williams*, 529 U.S. at 409; *see Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1400, 179 L. Ed. 2d 557 (2011) (holding new evidence introduced in federal habeas court has no bearing on Section 2254(d)(1) review, rejecting dicta in *Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam)). A state court's application of federal law is objectively unreasonable when the state court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Brown*, 544 U.S. at 141. However, a state court may "decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]" without running afoul of the "unreasonable application" clause. *Knowles*, 556 U.S. at 261. Notably, even a state court's incorrect application of law will not warrant federal habeas relief unless it is also objectively unreasonable. *See Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 785-86, 178 L. Ed. 2d 624 (2011).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). As with the "unreasonable application" clause, the Supreme Court applies the "objectively unreasonable" test

to the state court's factual determination.  *Miller-El v. Cockrell*, 537 U.S. 322, 324, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (dictum).  Petitioner must advance clear and convincing evidence that the state court's factual determination was "objectively unreasonable" to rebut the presumption that the determination was correct.  *Gill v. Mecusker*, 633 F.3d 1272, 1287 (11th Cir. 2011); 28 U.S.C. § 2254(e)(1).

The Eleventh Circuit in *Gill* clarified how the federal habeas court should address the "unreasonable application of law" and the "unreasonable determination of facts" tests.  *Id.* at 1288-89.  Mr. Gill's petition alleged he was denied his Sixth Amendment right to counsel.[5]  *Id.* at 1288.  The Eleventh Circuit granted a limited Certificate of Appealability to determine the precise issue of the validity of "summary affirmance by a state appellate court of a trial court's decision based on potentially flawed reasoning."  *Id.* at 1286.[6]

The *Gill* court acknowledged the well-settled principle that summary affirmances, such as the Second DCA's, are presumed adjudicated on the merits and warrant deference.  *Id.* at 1288 (citing *Harrington*, 131 S. Ct. at 784-85 and *Wright v.*

---

[5]  Mr. Gill twice moved the trial court in pretrial hearings to allow him to waive his Sixth Amendment right to counsel.  *Gill*, 633 F.3d at 1275-84; U.S. Const. amend. VI.  The trial court denied the first motion concluding that Mr. Gill's waiver of counsel was not knowing and intelligent.  *Gill*, 633 F.3d at 1278; *see Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) (accused must "knowingly and intelligently" waive representation).  The trial court also denied the second motion, but allowed Mr. Gill to act as co-counsel for himself only for determining trial strategy.  *Gill*, 633 F.3d at 1284. After Mr. Gill was convicted and timely requested post-conviction relief, the Florida Second District Court of Appeal ("Second DCA") affirmed without opinion the trial court's denial of said relief.  *Id.* at 1284-85.  Mr. Gill then filed a petition in federal court, which the district court denied with prejudice.  *Id.*

[6]  The Eleventh Circuit reviewed Mr. Gill's claims that the district court erred in its habeas corpus analysis as to two issues.  First, Mr. Gill argued that the habeas court erred by "failing to review on the merits the 'legally and factually unsupported rationale' articulated by the state trial court."  *Gill*, 633 F.3d at 1288.  Second, Mr. Gill argued the habeas court's decision was *per se* erroneous because it "relied on a finding that the state court did not make."  *Id.*  Specifically, Mr. Gill averred that the trial court denied relief by finding that his Sixth Amendment waiver was not knowing and intelligent, while the federal district court denied relief by finding that he "never clearly and unequivocally" waived his right to counsel.  *Id.*

*Sec'y for the Dep't of Corr.*, 278 F.3d 1245, 1254 (11th Cir. 2002)).  "A judicial decision and a judicial opinion are not the same thing," and the Supreme Court has confirmed that determining whether the state court unreasonably applied the law or unreasonably determined the facts requires only a decision, not an opinion.  *Id.* at 1291 (citing *Harrington*, 131 S. Ct. at 784).  Yet, the Supreme Court has never squarely addressed whether under the "unreasonable application" test a federal habeas court "looks exclusively to the objective reasonableness of the state court's ultimate conclusion or must also consider the method by which the state court arrives at its conclusion."  *Id.* at 1289 (quoting *Neal v. Puckett*, 286 F.3d 230, 244-45 (5th Cir. 2002) (summarizing the emerging circuit split)).  The Eleventh Circuit in *Gill* concluded that district courts must apply the plain language of Section 2254(d) and answer the "precise question" raised in a claim based on the state court's ultimate legal conclusion, and should not "evaluate or rely upon the correctness of the state court's process of reasoning."  *Id.* at 1291 (agreeing with the Fifth Circuit court in *Neal*, 286 F.3d at 244-45).  In short, the Eleventh Circuit held that "the statutory language focuses on the result, not on the reasoning that led to the result."  *Id.*[7]

In light of *Gill*, the "unreasonable determination of facts" standard plays a limited role in habeas review because the district court considers the reasonableness of the trial court's fact finding only to the extent that the state court's ultimate conclusion relied on it.  *Id.* at 1292.  A federal habeas court can consider the full record before it in order to answer "the only question that matters[:]" whether the state court's decision was objectively unreasonable.  *Lockyer*, 538 U.S. at 64; *Gill*, 133 F.3d at 1290.

---

[7] Applying this analysis, the Eleventh Circuit rejected Mr. Gill's claim that the district court erred by relying on different grounds than the trial court because Mr. Gill's basic premise—the Second DCA's summary affirmance relied on the trial court's statements from the bench—was not dispositive. *Id.* at 1288.

The Supreme Court recently summarized the meaning and function of habeas corpus in the federal system:

> Under §2254, a habeas court must determine what arguments or theories supported or . . . could have supported [ ] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of this Court.

*Harrington,* 131 S. Ct. at 786*.*  Federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's conclusion." *Id.* (internal quotations omitted)

The federal habeas court will take the final step of conducting an independent review of the merits of petitioner's claims only if it finds that petitioner satisfied AEDPA and Section 2254(d).  *See Panetti v. Quarterman*, 551 U.S. 930, 953-54, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).  The writ will not issue unless petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).  When performing its review under Section 2254(d), the federal court must resolve all claims for relief regardless of whether habeas relief is granted or denied.  *Clisby v. Jones*, 960 F.2d 925, 936 (11th Cir. 1992) (en banc); *see also Puiatti v. McNeil*, 626 F.3d 1283, 1307 (11th Cir. 2010).  The federal court must also bear in mind that state court factual determinations are presumed to be correct, and petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Crawford v. Head*, 311 F.3d 1288, 1295 (11th Cir. 2002) (AEDPA provides for a "highly deferential standard of review" for factual determinations made by a state court); *Jackson v. Anderson*, 112 F.3d 823, 824-25 (noting petitioner has heavier burden to overcome the presumption of factual correctness).  "If this standard is difficult to meet, that is because it was meant to be."  *Harrington*, 131 S. Ct. at 786.

## OTHER CONTROLLING LEGAL PRINCIPLES

**Deference to state court findings of fact**

Federal habeas courts defer to the state court's findings of fact, unless petitioner shows by clear and convincing evidence that it was unreasonable.  *See* 28 U.S.C. § 2254(d)(2); 28 U.S.C. § 2254(e)(1); *Callahan v. Hall*, 427 F.3d 897, 926 (11th Cir. 2005) (quoting the statute's language) ("[Section] 2254(d)(2) allows for relief where the state court adjudication 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'").  Under the AEDPA, the state court does not have to explicitly state its findings of fact.  *See Blankenship v. Hall*, 542 F.3d 1253, 1271-72 (11th Cir. 2008).  State court findings of fact can be implied from the opinion and the record when they are necessary to the Rule 3.850 court's rejection of a petitioner's claim.  *Id.*  These implicit findings are entitled to deference.  *Id.*  As explained in the Standard of Review, *supra*, the state court is not required to cite or be aware of the relevant Supreme Court precedent as long as its conclusion is not contradictory.  *Early*, 537 U.S. at 8.  A summary adjudication with a brief, or total lack of, statement of reasons is still an adjudication on the merits.  *Harrington*, 131 S. Ct. at 780, 784; *see Childers v. Floyd*, 642 F.3d 953, 968 (11th Cir. 2011) ("an 'adjudication on the merits' is best defined as any state court decision that does not rest solely on a state procedural bar.")

Under Eleventh Circuit precedent, the habeas court will "'look through' a summary decision to the 'last reasoned decision' on the issue."  *McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1262 n.12 (11th Cir. 2009) (quoting *Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1317 (11th Cir. 2006)); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 802, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991) (quoting *Coleman*, 501 U.S.

at 740) (the *Harris* presumption only applies after the habeas court determines that "'the relevant state court decision. . .fairly appear[s] to rest primarily on federal law or [is] interwoven with [federal] law.'")

## PETITIONER'S GROUND FOR RELIEF

**Ground 1**   **The trial court unreasonably applied clearly established federal law in denying Mr. Rembert's motion to suppress a pre-trial photo-pack identification.**

Mr. Rembert argues that the trial court erred in denying his motion to suppress of a photo-pack during trial (doc. 1, pp. 3-4). He contends that during the victim's deposition held prior to trial, the victim admitted he was taking Demerol (pain medication) at the time he viewed the photos. *Id*. Mr. Rembert alleges that the medication affected the victim's ability to focus mentally and visually. *Id*. He also asserts that the victim was wearing a patch over one eye and suffered from blurred vision. *Id*. Mr. Rembert proffers that the victim stated that the detective told him that the suspect was in the photo-pack. *Id*.

Based on the motion to suppress made during trial, the court held a hearing, heard sworn testimony (outlined below), applied the "*Biggers*[8] test" and denied the motion. Mr. Rembert argues that the trial court erred by giving the detective's testimony greater credibility than the victim's. *Id*. He alleges that the admittance of the photo-pack at trial violated his Fifth and Fourteenth Amendment rights. *Id*.

### State Court Decision

The First DCA affirmed the trial court's judgment and sentence without issuing an opinion (ex. H)

---

[8]*Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

<u>**Federal Review of State Court Decision**</u>

This claim depends upon the state court's evidentiary ruling during trial, and like all evidentiary rulings, there is a significant difference between an evidentiary error and a denial of due process.   An error of state law in the admission or exclusion of evidence is not, standing alone, a violation of due process.  *Thigpen v. Thigpen*, 926 F.2d 1003, 1011 (11th Cir.1991).

When reviewing a state court evidentiary ruling, generally federal courts "are not empowered to correct erroneous evidence rulings of state trial courts" *Boykins v. Wainwright*, 737 F.2d 1539, 1543 (11th Cir.1984).  "Nevertheless, when a state trial court's evidence rulings deny a habeas petitioner fundamental constitutional protections, this [c]ourt's duty requires it to enforce the constitution's guarantees by granting the petition for a writ of habeas corpus."  *Id.* at 1544.  Before relief can be granted the error "must rise to the level of a denial of fundamental fairness."  *Hall v. Wainwright*, 733 F.2d 766, 770 (11th Cir.1984).  Such fundamental unfairness violates the Due Process Clause of the United States Constitution.   *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir.1976).  A denial of fundamental fairness occurs whenever the improper evidence "is material in the sense of a crucial, critical, highly significant factor."  *Osborne v. Wainwright*, 720 F.2d 1237, 1238 (11th Cir.1983).

A pretrial identification may amount to a due process violation if the pretrial procedure was "unnecessarily suggestive and conducive to irreparable mistaken identification."  *Stovall v. Denno*, 388 U.S. 293, 302, 87 S. Ct. 1967, 1972, 18 L. Ed. 2d 1199, 1206 (1967); *see also Manson v, Braithwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

In *Biggers*, the Supreme Court established a two-step test in determining whether identification procedures are constitutional.   *Biggers*, 409 U.S. at 196-200.  The first step is to determine whether the procedures used were unduly suggestive.  *Id*. at 196-198.  If so, the second step is to determine whether, under the totality of

the circumstances, the identification was reliable.  *Id*. at 199.  The factors to be considered in assessing reliability are:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id*. at 199-200; *see also Irwin v. McDonough*, 243 Fed. Appx. 486, 492 (11th Cir. 2007); *Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987); *Code v. Montgomery*, 725 F.2d 1316, 1319-20 (11th Cir. 1984).  "[R]eliability is the linchpin in determining the admissibility of identification testimony."  *Manson*, 432 U.S. at 114.  "While the ultimate conclusion as to the reliability of identification evidence is a mixed question of law and fact not governed by the Section 2254(d) presumption, each of the *Neil v. Biggers* factors is considered an issue of fact governed by the presumption [of correctness]."  *Jones v. Newsome,* 846 F.2d 62 (11th Cir. 1988) citing *Sumner v. Mata*, 455 U.S. 591, 597, n.10, 102 S. Ct. 1303, 1307 n. 10, 71 L. Ed. 2d 480 (1982).

On federal habeas review, even if a petitioner demonstrates that an unconstitutional identification occurred, he is not entitled to relief if the identification constituted harmless error under the standard set forth in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); *see also Moore v. Illinois*, 434 U.S. 220, 232, 98 S. Ct. 458, 54 L. Ed. 2d 424 (1977) (holding harmless error analysis applies to admission of identification testimony obtained in violation of a defendant's constitutional rights).  In applying this analysis, courts are likely to find that the erroneous admission of the identification evidence was harmless where the evidence of guilt—excluding the contested identification evidence—is overwhelming.

To properly consider this claim, this court must first determine the factual record that was presented to the state trial court and then must examine the trial court's ruling.  Mr. Rembert's jury trial commenced on October 12, 2004 (ex. B, p. 1).

After opening statements, the state presented the testimony of Rima Kelly, the victim's landlord and neighbor, who on May 23, 2003, upon hearing loud noises emanating from the victim's trailer went to check on him. *Id*. at 67-92. There she saw that he was hurt and that the perpetrators, two black males, were still there. *Id*. Then, Jack Kelly, Rima Kelly's husband and a law enforcement officer, testified that once his wife notified him what she saw, he contacted the police and got his service weapon to attempt to apprehend the perpetrators. *Id*. at 93-130. Mr. Kelly arrived in time to shoot at the two vehicles leaving the scene. *Id*.

Leon County Sheriff's Deputy Brian Pearson then testified about receiving a call while on duty about a possible home invasion where the victim was injured and the suspects had fled. *Id*. at 131-153. He was told to "be on the lookout" for two black males in two sedans with bullet holes. *Id*. A Tallahassee police officer notified the Sheriff's Office that he had followed a vehicle riding on the rim of a tire in the area, and Deputy Pearson headed there. *Id*. Upon his arrival, Deputy Pearson found the vehicle stopped with a damaged back tire on the passenger side, and two black males with blood splatter in their pants and shoes. *Id*. Deputy Pearson identified Mr. Rembert in the courtroom as one of the two black males. *Id*. at 138-142. While searching Mr. Rembert, Deputy Pearson found a 12 gauge shotgun shell[9] (unfired cartridge) in his pants' back right pocket. *Id*.

Ronnie Whitmire, former Leon County Sheriff's Crime Scene Detective, testified about processing the vehicle crime scene. *Id*. at 159-194. He took pictures[10], which included the gun shot holes on the passenger side of the vehicle,

---

[9]Entered into evidence.

[10]Entered into evidence.

12 gauge shotgun with blood and hair on the barrel[11], and the numerous items[12] found inside the trunk and back seat. *Id.* There were no fingerprints of value found on the shot gun or most of the items found in the vehicle. *Id.*

Detective Donna Butler, who works at the Leon County Sheriff's Violent Crimes Unit, testified that she was called to the vehicle crime scene and later questioned Mr. Rembert at the police station. *Id.* at 228-263. She identified Mr. Rembert in the courtroom as one of the suspects she took pictures[13] of on the night of the incident. *Id.* The pictures showed blood on his blue jeans, his socks, and his white tennis shoes. *Id.* Mr. Rembert also had an injury on his shin, which was photographed. *Id.* Detective Butler took Mr. Rembert's clothing and possessions[14] before sending them to the Florida Department of Law Enforcement ("FDLE"). *Id.*

Deputy James Goodman from the Leon County Sheriff's Office testified that he was on duty on the night of the incident and was dispatched to the trailer crime scene after Mr. Kelly called 911. *Id.* at 266-276. He cleared the residence with Mr. Kelly to make sure that there were no suspects inside. *Id.* Then, he made contact with the victim, who was lying face down on the floor bleeding profusely and could not communicate. *Id.* The victim had large gashes on the back of his head and wounds in his arms that were bleeding. *Id.* The victim was moaning and saying "don't hit me anymore" or "don't hurt me anymore." *Id.* EMS arrived and took care of the victim. *Id.* Deputy Goodman then took the names of those that were in the crime scene and turned it over to Deputy Steve Woodcock. *Id.*

---

[11]Entered into evidence.

[12]Mrs. Kelly had previously identified some of these items as belonging to her brother and kept at the trailer, which is owned by her brother and was rented to the victim. *Id.* at 67-92.

[13]Entered into evidence.

[14]Entered into evidence.

Deputy Woodcock from the Leon County Sheriff's Crime Scene Unit testified that he was called to the trailer crime scene to process it and collect the evidence. *Id*. at 278-299.  When he arrived, the victim had been taken by ambulance to the emergency room.  *Id*.  He took many photographs[15] of the interior of the trailer showing the disarray and pools of blood, the road leading to the trailer, and a piece of paper[16] with the tag numbers of two vehicles.  *Id*.  Mr. Rembert was arrested while standing by one of the vehicles listed on that piece of paper (vehicle crime scene). *Id*. at 136-137, 311.

Michael Halligan, Leon County Sheriff's Violent Crimes Detective, testified that he was unable to speak to the victim right away because he was taken to surgery. *Id*. at 309-314.  He finally spoke to the victim on May 28, 2003 and showed him photographic lineups.  *Id*.  Mr. Rembert's counsel interrupted the testimony and requested a side bar to request the suppression of the photographic lineups, and the court proceeded with an evidentiary hearing outside of the jury's presence in order to rule on the matter.  *Id*. at 314-337.  Detective Halligan proffered that he had been trained on the procedures of doing photographic lineups and he consistently follows them.  *Id*.  He spoke to the victim over the phone at his parents' house and inquired if he was well enough to give a statement and view photo lineups.  *Id*.  The victim agreed.  *Id*.  Detective Halligan visited the victim and first gave him a form[17] that stated:

> You will be asked to look at a group of photographs.  The fact that the photographs are shown to you should not in any way influence your judgment.  You should not conclude or guess that the photographs contain the picture of the person who committed the crime.  You are not obligated to identify anyone.  It is just as important to free innocent

---

[15]Entered into evidence.

[16]Entered into evidence.

[17]Entered into evidence.

> **persons from suspicion as to identify guilty parties.  Please do not discuss the case with other witnesses nor indicate in any way that you have or have not identified someone.**

*Id*. **He then asked the victim whether he understood to which the victim replied yes and signed the form.  *Id*.  Detective Halligan did not tell the victim that there were suspects in the photo lineups, nor which box to pick.  *Id*.  On cross-examination, Detective Halligan described the victim at that time as having facial injuries and possibly having an eye patch over one eye.  *Id*.  The victim said he was well enough to look at the photographs and Detective Halligan believed him.  *Id*.**

**The victim then testified at the hearing that he remembered Detective Halligan visiting him to get a statement and to show him photographic lineups.  *Id*.  The victim confirmed his signature in the form.  *Id*.  He was still recovering and on pain medication, but he read and understood the form.  *Id*.  The victim denied that Detective Halligan told him there was a suspect in the pictures, or that he had to pick out somebody, or who to pick out specifically.  *Id*.  On cross-examination, however, the victim attested to his deposition testimony that he was under the impression that there were suspects in the photographic arrays.  *Id*.  He stated that he was told that within the photo arrays there contained a photograph of a suspect.  *Id*.  The victim denied using an eye patch on that day, and described his eyesight as blurry.  *Id*.  On re-direct, he explained that although his vision was a little blurry, he could see the pictures clearly while looking out of the top left corners of his eyes.  *Id*.  He also reiterated that the identifications he made were because he recognized the people, and when he did not, then he said so.  *Id*.  The victim recounted how he met his attackers at a bar and interacted with them for some time, and that he saw them clearly at his trailer.  *Id*.  He advised that he could no longer identify his attackers, and has memory and vision problems as a result of his injuries from the attack.  *Id*.**

**The trial court ruled that the police did not use an unnecessarily suggestive procedure.  *Id*. at 344-349.  It considered the credibility of Detective Halligan and his**

experience and training in performing photographic lineups. *Id*. The trial court expressed concern as to the victim's ability to remember what he was told because he had some blocks and due to his demeanor - "he seemed kind of slow and deliberate and have some difficulty." *Id*. The trial judge pointed out that the victim answered the prosecutor's questions one way and then the defense questions another way, yet she did not feel that he was trying to mislead anybody. *Id*. The trial court reasoned that she believed Detective Halligan did his job properly, and that the victim over time convinced himself that he was told that since he found out later that the suspects that he identified were arrested, which can happen with short-term or long-term memory losses as is the case here. *Id*.

As to the second prong, the trial court determined that there was not a substantial likelihood of irreparable misidentification because the victim explained that even though "his vision was generally blurred, there was an angle at which he could see clearly." *Id*. The victim also identified the suspects three days after spending an extended period of time with the people that later robbed and battered him. *Id*. The trial court analyzed the totality of the circumstances at the time of the photo lineup. *Id*. It added that the victim picked out two people that had been previously arrested with his blood on their clothes so there was little concern of misidentification. *Id*. Therefore, the trial court denied the motion to suppress the photo lineup. *Id*.

Detective Halligan then repeated his hearing testimony for the jury. *Id*. at 350-363. He also testified that one of the photographic lineups contained Mr. Rembert's picture of his face and head from the night he was taken into custody and five other people with similar age, race, hair color and facial hair from the Sheriff's Office database. *Id*. The victim without hesitation identified Mr. Rembert as "the one holding the shotgun," and put his initials and date in the corner of the box with the

picture[18].  *Id*.  The victim identified two of the defendants in the three photo lineups shown by Detective Halligan on that day.  *Id*.  Detective Halligan took a buccal swab of the victim[19] to use in DNA comparison.  *Id*.

Dr. Duncan Postma was qualified as a head and neck surgery expert, and testified that he was on call at Tallahassee Memorial HealthCare the morning of May 24, 2003.  *Id*. at 381-393.  He was called into the hospital to take care of the victim due to his serious injuries.  *Id*.  Dr. Postma attested that pictures of the victim[20] depicted the victim's condition when treated at the hospital by him.  *Id*.  The victim's injuries consisted of three lacerations: one major above his right eyebrow that went into the skull, another one through and through in his right ear, and a simple one on his left upper eyelid; and blow-out fractures of the left and right orbits that hold the eyeballs in place.  *Id*.  Dr. Postma considered the injuries life threatening.  *Id*.  To do the major laceration and ear laceration would require a very sharp object or a very strong force; a punch with a hand or kick with a tennis shoe would not do that.  *Id*. The victim's injuries were consistent with multiple blows.  *Id*.  Dr. Postma performed surgery on the victim's lacerations that afternoon, and the victim had to be hospitalized after surgery.  *Id*.  The injuries resulted in scarring.  *Id*.

The victim testified that he had rented the Kelly's trailer for two months prior to the incident.  *Id*. at 400-486.  Some of the Kelly's belongings were at the trailer, and he was responsible for them.  *Id*.  On the night of May 23, 2003, around 10pm, he went to a bar to meet up with some friends from work, but they did not show up. *Id*.  He stayed and drank alcohol with some people, including a group of black young men celebrating one of their birthdays.  *Id*.  He also talked to several girls, and tried to get them to come back to the trailer for an after-party.  *Id*.  His trailer was located

[18]Entered into evidence.

[19]Entered into evidence.

[20]Entered into evidence.

eight minutes from the bar.  *Id*.  He stayed at the bar until it closed, and then he went to a convenience store outside the city limits to buy more alcohol.  *Id*.

When he arrived at his trailer he saw two vehicles, placed the alcohol (beer) on the roof of his car, and talked to three black males in the cars to tell them there would be no after-party because the girls had not shown up and he was going to bed.  *Id*.  He did not invite them into the trailer.  *Id*.  He took the beer, went inside the trailer into either the bathroom or bedroom.  *Id*.  He heard the cars still running outside so he went back outside and told them again that he was going to bed.  *Id*. At that time he felt nervous, like something was not right, and he took notice of the vehicles' license plates.  *Id*.  He went back inside the trailer and wrote down the tag numbers on a piece of paper.  *Id*.  He looked up and saw the three black men in his kitchen.  *Id*.  One of them was holding a shotgun and he asked "what the hell is that for."  *Id*.  He tried to grab the shotgun to take it away, but he was not able to, and another of the black males pulled a pistol and stuck it to his head.  *Id*.  He became very scared and peed on himself.  *Id*.  He started getting hit so he tried to get to the front door and almost made it, but getting hit on the back of his head prevented him from reaching it.  *Id*.  He never gave those men permission to enter the trailer or take anything from there.  *Id*.  Next thing he remembers was waking up at the hospital. *Id*.

The victim showed his scars to the jury.  *Id*.  As a result of his injuries, he does not have peripheral vision on his right eye and when he looks down he sees double. *Id*.  He also has memory problems such as inability to remember places he has been, names, dates and times.  *Id*.  He confirmed his signature and initials in the photo lineups.  *Id*. He admitted misidentifying another defendant during his deposition due to his memory problems and stress.  *Id*.  He had a pending charge for disorderly conduct, but had not been offered anything by the prosecutor regarding it.  *Id*.  He

identified pictures[21] showing some of his belongings that he retrieved from the Sheriff's Office once he was feeling better. *Id*. He mentioned other items that were still missing[22]. *Id*.

On cross-examination, the victim testified that he invited two girls, a bouncer and a bartender back to his trailer that night. *Id*. He said it was possible that he invited the black males. *Id*. The two vehicles arrived simultaneously to his arrival at the trailer. *Id*. He assumed the women were not coming because it was approximately 15 to 20 minutes from the convenience store where he bought the beer to his trailer, which is why he told the black males there would be no party. *Id*. He did not see who hit him. *Id*. He was first hit right behind his right ear. *Id*. He could not identify anyone in court. *Id*. When discussing the photo lineups, the victim assumed they contained a suspect. *Id*. Detective Halligan told him either before or after that there were two possible suspects in those lineups. *Id*.

N. Leroy Parker, crime lab analyst supervisor at FDLE's Orlando region, was qualified as an expert blood spatter analysis and testified that he performed bloodstain analysis on the evidence in this case. *Id*. at 503-529. He discussed his findings in his report,[23] which showed impact and contact blood spatter on the lower part of the pants, socks and tennis shoes of Mr. Rembert and another defendant (both arrested at vehicle crime scene). *Id*. "[T]he significance of that means that the individual wearing those [pants, socks and sneakers] at one time or several times came in contact with a bloody object[, and] they were also present at the time forceful bloodshed occurred, resulting in forceful bloodshed being deposited on the lower area of those [pants, socks and sneakers]." *Id*. He approximated the distance from the bloody object, the victim, to the people wearing those clothes was at most

---

[21]Entered into evidence.

[22]Record shows that only one of the two vehicles was apprehended the night of the incident.

[23]Entered into evidence.

four feet, but most likely between two or three feet.  *Id*.

Terrance Chisolm, co-defendant who plead[24] no contest before Mr. Rembert's trial, testified as to his and the other three defendants' involvement.  *Id*. at 530-609. His charges were armed robbery with a deadly weapon, burglary of a dwelling with a firearm and a person assaulted, and aggravated battery with a firearm.  *Id*.  He understood that he could be sentenced to life in prison, and had no deal from the state for a reduced sentence.  *Id*.  He only hoped for mercy from the court due to his cooperation.  *Id*.

Mr. Chisolm met Mr. Rembert the night of the incident, and identified him in court.  *Id*.  He saw the shotgun at the home of another defendant prior to them going out to the bar, but could not remember who had it.  *Id*.  He was drinking at the bar. *Id*.  The four of them were riding in two cars.  *Id*.  He was a passenger in one car, and Mr. Rembert was riding in the other car.  *Id*.  They left with the victim, and followed him to his trailer.  *Id*.  On the way there, there was no intention to rob and beat the victim.  *Id*.  It first came up when they arrived at the trailer and Mr. Rembert and another defendant brought it up while they were in the parking area.  *Id*.  Either Mr. Rembert or that other defendant had the shotgun and were the first to go into the trailer; he was the last one to go inside.  *Id*.  He saw Mr. Rembert hit the victim with his fist.  *Id*.  Mr. Rembert took things out of the trailer.  *Id*.  All of them stole things out of the trailer.  *Id*.  The victim was laying face down on the floor bleeding, and Mr. Chisolm was given the shotgun and stood next to him while holding it.  *Id*.  He was told to tie the victim, and he wrapped a cord off a video game controller around his arms.  *Id*.

After they left the victim's residence Mr. Chisolm saw Mr. Rembert loading things into the car that he was riding in, and into the car Mr. Chisolm was a passenger in because the other car was full.  *Id*.  He saw a person coming over with a flashlight, got scared, and they left.  *Id*.  He was a passenger in one car and Mr.

---

[24]**Entered into evidence.**

Rembert was a passenger on the other car.  *Id*.  His car went the wrong way, toward the trailer, turned around and then went on the highway.  *Id*.  Their car was the second car to leave the area.  *Id*.  He saw a man shooting at their cars.  *Id*.  They ended up in a residential area with a flat tire, saw a fire engine go by, got scared, left the car and ran.  *Id*.  The defendant he was with called a girlfriend who came by to pick them up.  *Id*.  He threw his clothes into a trash compactor where he lived, and never got the things he stole that night.  *Id*.

Mr. Chisolm went to the Leon County Sheriff's Office a few days later and talked to Detective Halligan about what happened.  *Id*.  Out of fear, he did not tell him everything, like him standing over the victim with the shotgun.  *Id*.  Months later, he called an investigator in the prosecutor's office and told him the rest of the things that he had not told Detective Halligan.  *Id*.  He was eventually arrested and charged.  *Id*.

On cross-examination, he clarified that the statement he gave originally was truthful but incomplete.  *Id*.  The victim came up to them at the bar and introduced himself, but did not hang out with them.  *Id*.  Mr. Rembert was drinking beer at the bar.  *Id*.  The victim invited them over to the trailer for a party , and they followed him to the convenience store and then to his trailer.  *Id*.  Even though he saw someone put the shotgun in the other car, there was no conversation about robbing anyone prior to them going to the bar or after they left the bar before reaching the victim's trailer.  *Id*.  He did not recall the victim coming out of the trailer.  *Id*.  The victim did not say that there would not be a party.  *Id*.  He did not see the victim go behind their cars to look at the license plates.  *Id*.  He did the crime out of fear of the other defendants because they said "get down or lay down" meaning either you are with us or you are against us.  *Id*.  He denied hitting the victim.  *Id*.  He felt bad about what happened to the victim.  *Id*.  On re-direct, Mr. Chisolm admitted that the other defendants did not threaten him or point a weapon at him.  *Id*.

Ronnie Austin, investigator with the prosecutor's office, testified that he took the buccal swab[25] of Mr. Rembert to be used by the FDLE in DNA comparison.  *Id*. at 616-620.   Jeff Foggy, FDLE crime laboratory analyst, was qualified as a forensic firearms expert and testified regarding his report[26] in this case.  *Id*. at 621-628.  He examined the 12 gauge pump action shotgun and found it operational with a cut barrel.  *Id*.  The barrel was manufactured at 28 inches and was later cut to 15 7/8 inches.  *Id*.  In Florida, the minimum length of a lawful firearm is 18 inches.  *Id*.  Mr. Foggy also examined the unfired shotgun shell found in Mr. Rembert's pocket and determined that it would be appropriate ammunition for the shotgun.  *Id*.

Chris Bacot, FDLE analyst in the biology section in Tallahassee's crime lab, was qualified as a DNA analysis expert and testified about his reports[27] where he tested the evidence for human blood.  *Id*. at 629-662.  He matched the DNA sample from the victim to the spots in the jeans taken from Mr. Rembert.  *Id*.  In those jeans, Mr. Bacot found DNA of both the victim and Mr. Rembert.  *Id*.  He also found the victim's DNA in the shotgun.  *Id*.  He did not test the tennis shoes or the socks.  *Id*. The state rested and the defense did not present any witnesses.  *Id*. at 658 and 731.

Under *Biggers*, the state court first analyzed whether the pre-trial identification was unduly suggestive and found that it was not.  *Id*. at 344-349.  This court agrees. Detective Halligan testified as to the procedure he used while showing the victim the photo lineups, and more noteworthy the form that the victim read and signed prior to being shown the photos.  *Id*. at 321-325.  Nothing in the procedure or the form was unduly suggestive.  Mr. Rembert bases his argument in the victim's testimony that he assumed or was told by Detective Halligan that there were suspects in the photo lineups before seeing the photos.  However, the victim contradicted himself in his testimony by answering to the prosecutor that he was not told this and then

---

[25]Entered into evidence.

[26]Entered into evidence.

[27]Entered into evidence.

answering to the defense that he was.  *Id*. at 326-337.  This court owes deference to credibility determinations by the trial court.  *Baldwin v. Johnson*, 152 F.3d 1304, 1317 (11th Cir. 1998).  The victim was brutally beaten and suffered severe injuries to his head, which resulted in vision and memory problems.  The trial court's assessment, that his contradictory testimony did not outweigh Detective Halligan's or the signed form that he attested reading, understanding and signing prior to seeing the photos, is reasonable.

The trial court, despite not finding the identification unduly suggestive, discussed *Biggers*' second prong, the likelihood of irreparable misidentification, and concluded that there was none.  Under the totality of the circumstances at the time of the identification, the photo lineup identification was reliable because the victim was able to look at Mr. Rembert and the other defendants for a while at the bar and then later that night when they entered his trailer.  The victim testified that even though he had vision problems as a result of the attack, he could see the photos clearly.  The victim identified Mr. Rembert instantly three days after the incident.  The fact that he could not identify Mr. Rembert later on after a long time had passed since the incident is reasonable due to the head injuries he suffered at the hands of the defendants.

The trial court's conclusion is strongly supported by the evidence as adduced at the trial, and it is entitled to deference.  Even if there had been an unconstitutional identification, which this court does not find, it would have been harmless error due to the overwhelming evidence of guilt as to Mr. Rembert.  He was arrested on the night of the incident next to a car with bullet holes near the trailer crime scene.  His jeans, socks and tennis shoes were covered with the victim's blood.  That vehicle's tag number was listed on the piece of paper that the victim wrote down as the license tags of the perpetrators' cars.  He had in his pocket a 12 gauge shotgun shell, which was the appropriate ammunition for the shotgun found with the victim's blood and hair.  Mr. Chisolm testified seeing him hit the victim, and taking items from

the trailer.  The car Mr. Rembert was riding in was full of the stolen items as identified by the victim and Mrs. Kelly.

The state court's ruling was not unreasonable under *Strickland*, did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d)(1)(2); *Williams,* 529 U.S. at 409.  Mr. Rembert is not entitled to federal habeas relief, and the writ should not issue.

## CONCLUSION

The undersigned has carefully reviewed the trial transcript, post-conviction motion and addenda, orders, records on appeal, and all submissions in this proceeding.  Mr. Rembert's claim is without merit.  He is not entitled to federal habeas relief.

## CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  Rule 11(a), Rules Governing Section 2254 Cases.  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, it is recommended that the court deny a certificate of appealability in its final order.

Rule 11(a) also provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  If petitioner files an objection to this recommendation, he may bring this argument to the attention of the district judge in his objections.

Accordingly, it is respectfully RECOMMENDED:

1.      That the petition for writ of habeas corpus (doc. 1) challenging the conviction and sentence in *State of Florida v. Rembert*, in the Circuit Court of Leon County, Florida, case number 03-01825AF, be DENIED and the clerk be directed to close the file.

2.      That a certificate of appealability be DENIED.

At Pensacola, Florida this 22nd day of August, 2012.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).**